# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 14, 2014 Session

## STATE OF TENNESSEE v. JEFFERY NEWTON

**Appeal from the Circuit Court for Marion County**
**No. 8684     Thomas G. Graham, Judge**

---

**No. M2013-00463-CCA-R3-CD - Filed April 29, 2014**

---

The Defendant, Jeffery Newton, was convicted by a Marion County Circuit Court jury of attempt to commit aggravated assault, a Class D felony. *See* T.C.A. § 39-13-102 (2010). The trial court sentenced the Defendant as a Range I, standard offender to two years and nine months with thirty days to serve in confinement and the remainder to serve on probation. On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erroneously denied his motion to dismiss the indictment, (3) the trial court erred during jury instructions, and (4) his sentence is excessive. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Howell G. Clements (on appeal and at trial) and Paul D. Cross (at trial), Monteagle, Tennessee, for the appellant, Jeffery Newton.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; J. Michael Taylor, District Attorney General; and David McGovern, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to a disagreement between the Defendant and Jerry Rankin, the Defendant's uncle. At the trial, Manuel Kilgore testified that he worked at the Marion County Griffith Creek garbage disposal site in August 2009. He said he controlled the button to compact trash and picked up loose trash on the ground with a stick with a nail attached at the end. He said Carl Griffith, a friend, stopped by to see him at work one day in August 2009. He said they were talking when Mr. Rankin drove to the disposal site. He said Mr.

Rankin disposed of his trash, walked over to him and Mr. Griffith, and joined the conversation. He said the Defendant arrived a few minutes later. He said the Defendant "confronted" Mr. Rankin about the Defendant's job. He said that although he did not know what was said, the Defendant and Mr. Rankin talked for a few minutes and that the Defendant picked up the stick with the nail and placed it on his shoulder. The stick was about four to five and one-half feet long. He said the Defendant cursed Mr. Rankin. He stated that the Defendant turned to him and apologized for making a scene and that Mr. Rankin began walking to his car. He said that the Defendant followed Mr. Rankin and that they continued to talk. Mr. Rankin got into his car and left, and the Defendant returned the stick to Mr. Kilgore.

Mr. Kilgore testified that the nail on the stick was facing forward when the Defendant placed it on his shoulder. He denied Mr. Rankin showed the Defendant any aggression. He said Mr. Rankin returned to the disposal site later, wanted to obtain a warrant for the Defendant's arrest, and asked him to tell the police what he saw. Mr. Kilgore refused to talk to the police without a subpoena.

On cross-examination, Mr. Kilgore testified that the Defendant did not swing the stick at Mr. Rankin and that he did not hear the Defendant threaten Mr. Rankin with the stick. He understood the conversation to be about the Defendant's job. He said the Defendant left after Mr. Rankin but returned a few minutes later. The Defendant told him and Mr. Griffith, "You'uns didn't see nothing." When asked if the Defendant meant that they did not see the Defendant hit Mr. Rankin with the stick, he denied knowing what the Defendant meant.

Carl Griffith testified that he knew who Mr. Rankin was but that they were not close friends. He said that in August 2009, he was talking to Mr. Kilgore at the disposal site when Mr. Rankin arrived. He said Mr. Rankin disposed of his trash and walked over to them. He said the Defendant arrived a few minutes later and began cursing Mr. Rankin. He did not see the Defendant with any trash and said the Defendant was not using a wheelchair, walker, or cane. He saw the Defendant pick up a stick with a nail attached at the end. Mr. Rankin began walking toward his truck, and the Defendant followed him with the stick on his shoulder. He stated that Mr. Rankin's truck was about twenty to thirty feet away and that he could not hear what Mr. Rankin and the Defendant said. He said Mr. Rankin drove away.

On cross-examination, Mr. Griffith testified that the Defendant never removed the stick from his shoulder or threatened Mr. Rankin. He said that although he could not hear the Defendant and Mr. Rankin after they walked to Mr. Rankin's car, they were within eyesight. He agreed he did not see anything to indicate that the Defendant was going to strike Mr. Rankin with the stick. He said the incident was "a cussing." He said the Defendant believed Mr. Rankin had meddled in the Defendant's job. He denied the

Defendant left his car with a weapon and said the Defendant left his car, started cussing Mr. Rankin, picked up the stick, and placed the stick on his shoulder. He agreed he did not call the police afterward because he did not see a need to call them. He did not believe the Defendant was going to strike Mr. Rankin with the stick.

Jerry Rankin testified that he went to the disposal site in August 2009. He said he disposed of his trash and walked over to talk to Mr. Kilgore and Mr. Griffith. He said that at that time, he was getting ready to have knee replacement surgery and had received disability benefits for several years. He said the Defendant arrived, got out of his car using the "'F' word," and accused him of causing the Defendant to be fired. He denied interfering with the Defendant's job. He told the Defendant to stop cursing him. He said that the Defendant grabbed a stick with a nail attached at the end and that he began walking to his van. He said the Defendant followed him and threatened to "knock [his] brains out." He said the stick was on the Defendant's shoulder when he made the statement. He said, though, he feared for his safety and left. He denied "swinging" at the Defendant.

Mr. Rankin testified that the Defendant did not hit him with the stick and that he was not injured. He said the Defendant got out of his car without the assistance of a cane, walker, or wheelchair. Although he denied knowing why the Defendant acted like he did, he said there had "been a split in the family" regarding a murder case. He said he was "the black sheep of the family" because he "told the truth."

On cross-examination, Mr. Rankin testified that he reviewed his testimony from the preliminary hearing before the trial. He agreed he testified at the preliminary hearing that the Defendant "wasn't aiming to do nothing, he was just running his mouth." He said, though, he was confused by the question and thought counsel might hit him. He said later, though, that he did not recall making the statement. The parties stipulated that Mr. Rankin made the statement during his preliminary hearing testimony.

Mr. Rankin testified that during the incident, he was standing beside Mr. Kilgore. He agreed that at the preliminary hearing, he testified that the Defendant swung the stick at him, that the Defendant was two feet away when the Defendant swung the stick, and that the stick was three to four feet long. He agreed that had the Defendant swung the stick, the Defendant could not have missed hitting him because he was a big man.

Mr. Rankin testified that he was 6'11" and weighed 324 pounds and that he did not care how big or small the Defendant was because "you can take a stick and kill a man with it." He agreed he was taller and weighed more than the Defendant. He denied knowing if the Defendant received disability benefits and denied taking photographs of the Defendant when he was working at "Campbell's." He denied calling the Social Security Administration

regarding the Defendant's working. Regarding the family dispute related to the murder trial, he said the family talked the Defendant into "starting trouble" with him in order to help Don Rankin with his murder trial. He said his family did not speak to him anymore.

Mr. Rankin's preliminary hearing testimony was played for the jury. We note that the recording of the testimony is not included in the appellate record.

Shelia Atterton testified that Mr. Rankin was her brother and that the Defendant was her nephew. She believed Mr. Rankin was an untruthful person and denied she would "believe him under oath."

On cross-examination, Ms. Atterton testified that Mr. Rankin was a good person, although he had faults. She denied having a "falling out" with Mr. Rankin, although she admitted his actions hurt her feelings. She disagreed that a family spilt occurred as a result of Don Rankin's murder trial. She agreed that she testified for the defense at the murder trial and that Mr. Rankin supported the prosecution.

Simone Kilgore testified that she had known Mr. Rankin almost all her life and that Mr. Rankin had a reputation for being a liar. She had known the Defendant for about four years and said he was disabled at the time of the incident.

On cross-examination, Ms. Kilgore testified that she was the Defendant's girlfriend. She did not know if the Defendant was working on cars to earn extra money in August 2009. She denied he worked on cars at the time of her testimony. She said that the argument in the present case related to Mr. Rankin's calling "someone the Defendant was helping." She said Mr. Rankin attempted to "get trouble started" for the Defendant. She did not know if the Defendant performed mechanic work from a wheelchair or walker in August 2009.

The Defendant testified that he had performed automobile collision repair work until he was injured on the job in 1994. He said that his injuries focused on his pelvis, left leg, and left knee and that he underwent three surgeries. He said that in August 2009 he used a walker periodically because he had "good days and bad days." He said one of his legs was shorter than the other, which caused him to walk with a limp since 1994.

The Defendant testified that in 2009, he worked on "knickknack stuff" from his "scooter stool" at Campbell's auto body shop. He said, though, he could not lift more than five or ten pounds. He saw Mr. Rankin across the road from Campbell's auto body shop taking photographs of his working. He said Mr. Rankin thought he could get him in trouble regarding his disability benefits. He said he was permitted to work some and receive disability benefits as long as he reported it. He said his physician prescribed the use of a

wheelchair nine months earlier. He described the surgeries he underwent and identified photographs taken during the surgeries.

The Defendant testified that Mr. Rankin drove by his house at 10:30 a.m. on the day of the incident. He said Mr. Rankin stopped at the end of his driveway, cursed him, and yelled for him to walk down the driveway to fight. He said that he was in his yard when Mr. Rankin stopped and that he refused to walk toward Mr. Rankin. He said he was in no condition to fight anyone.

The Defendant testified that he went to the disposal site around 1:30 p.m. on the day of the incident to throw away trash inside his car. He denied having intentions of doing anything other than disposing of his trash and denied knowing Mr. Rankin would be there. He saw Mr. Rankin, who gave him a "dirty" look, walked to where Mr. Rankin was standing, and confronted Mr. Rankin about telling the owner of Campbell's auto body shop he was a thief and a liar. He admitted cursing Mr. Rankin and picking up the stick. He said that Mr. Rankin looked at the stick continuously, that he picked up the stick, and that he placed it on his shoulder to prevent Mr. Rankin's grabbing it. He said the stick never left his shoulder. He denied intending to hit or scare Mr. Rankin and said Mr. Rankin cursed him, too. He said that Mr. Rankin began to leave and that he followed him but stopped when Mr. Rankin walked past the Defendant's car. He said it was just a "cussing match."

The Defendant testified that after Mr. Rankin left, he returned the stick to Mr. Kilgore, apologized for the scene, and went home. He said he and Mr. Rankin had not had problems since the incident, other than Mr. Rankin's attempting to "jump" him at Castle's Gas Station.

On cross-examination, the Defendant testified that in August 2009, he used a cane and walker periodically but that he did not use either the day of the incident. He said he was unable to drive a car with a manual transmission. He agreed he did not mention to Mr. Kilgore that Mr. Rankin had been to his house earlier that morning but said Mr. Kilgore had nothing to do with his argument with Mr. Rankin.

The Defendant testified that Mr. Rankin prevented his working at Campbell's auto body shop. He said, though, he painted a car door for the owner in exchange for his being permitted to repair his car. He agreed he did not dispose of any trash when he was at the disposal site and said trash was the last thing on his mind after arguing with Mr. Rankin. He said that when he got out of his car and walked toward Mr. Rankin, about two feet separated them. He demonstrated the look Mr. Rankin gave him and said he was scared because he was much shorter than Mr. Rankin. He agreed Mr. Rankin never lunged at him and said he never lunged at Mr. Rankin. He denied using the stick to help him walk and said he held onto the dumpster. He said that they maintained the same distance when he and Mr. Rankin

walked toward Mr. Rankin's car. He denied that Mr. Rankin walked to his car quickly and that Mr. Rankin was scared.

The Defendant testified that after he left the disposal site, Mr. Rankin's wife called him and said Mr. Rankin was obtaining a warrant against him. He said he returned to the disposal site to throw away trash, that he asked Mr. Kilgore and Mr. Griffith what they saw, and that he told the men they did not see anything.

In rebuttal, Dwight Miller testified that he worked at the Marion County Clerk's Office in the vehicle title division. He said that he knew the Defendant and that in his opinion, the Defendant was "a pathological liar."

Attorney John Cameron testified that he knew the Defendant. Although the Defendant had never been a client, he had represented a client in a matter in which the Defendant was the opposing party. He said that in his opinion, the Defendant was an untruthful person. On cross-examination, Mr. Cameron said that he had worked on hundreds of cases throughout his career, that he had met many people who had not told the truth, and that many of his clients had not told the truth. On redirect examination, he stated that the Defendant was under oath at the time he made an untruthful statement.

Eric Layne, Mr. Rankin's nephew, testified that he had known Ms. Atterton all his life and that in his opinion, she was "a pathological liar." He said that he knew the Defendant and that in his opinion, the Defendant was a liar, too. On cross-examination, he said that Mr. Rankin was the most truthful person in the family and that the Defendant's side of the family was "a bunch of liars." He admitted he had "probably lied" previously.

Mr. Rankin was recalled by the State and testified that he did not go to the Defendant's house, park at the end of his driveway, or attempt to fight the Defendant the day of the offense.

Upon this evidence, the Defendant was convicted of attempt to commit aggravated assault. The trial court sentenced him as a Range I, standard offender to two years and nine months with thirty days to serve and the remainder on probation. This appeal followed.

## I

The Defendant contends that the evidence is insufficient to support his conviction. The State responds that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"'A crime may be established by direct evidence, circumstantial evidence, or a combination of the two.'" *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this appeal, "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be." T.C.A. § 39-12-101(a)(1) (2010). Likewise, a defendant commits aggravated assault when he intentionally or knowingly commits an assault and displays a deadly weapon. *Id.* § 39-13-102(a)(1)(B) (2010). An assault occurs when a defendant "intentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2) (2010).

In the light most favorable to the State, the Defendant arrived at the garbage disposal site, he got out of his car using the "'F' word" and accused Mr. Rankin of getting him fired. Mr. Rankin told the Defendant to stop cursing him, and the Defendant grabbed a stick with a nail attached at the end. Mr. Rankin said he feared for his safety and believed the nail on the stick could kill him. Mr. Rankin began walking to his van to get away from the Defendant, and the Defendant followed him. Mr. Rankin said the Defendant threatened to "knock [his] brains out." Although the parties stipulated that at the preliminary hearing Mr. Rankin testified that the Defendant "wasn't aiming to do nothing, he was just running his mouth," any conflicts in the testimony were resolved by the jury. Likewise, the credibility of the witnesses was determined by the jury, and the verdict reflects that it credited Mr. Rankin's trial testimony. The jury could have found that the Defendant acted with the intent

to place Mr. Rankin in fear of imminent bodily injury and believed that his conduct would place Mr. Rankin in such fear. We conclude that the evidence is sufficient and that the Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erroneously denied his motion to dismiss the indictment. He argues the court violated double jeopardy principles because the trial judge set aside the aggravated assault verdict after the first trial pursuant to Tennessee Rule Criminal Procedure 29(b). He also claims the court violated the law of case doctrine. The State responds that the trial court properly denied the motion to dismiss and that double jeopardy principles were not violated because the judge set aside the verdict when acting as the thirteenth juror. We agree with the State.

The record shows that the Defendant was convicted of aggravated assault at the first trial on August 30, 2010. After the jury was dismissed, the trial judge stated on the record that he was

> going to save both of you some time[.] I'm not going to let an aggravated assault charge stand in that case. I'm going to go ahead, and set it aside, and that puts you in a posture to go ahead, and be able to appeal it then, and we won't waste our time doing a pre-sentence report and all the other hoops, so draw me an order. I'm going to set it aside, and we'll treat it as a motion for new trial that I'm granting. . . . And we'll either put it back on the next plea and assignment, and if you guys want to appeal it, we'll put it off until y'all get though with that process, but that case is not an aggravated assault case, and I'm not going to let that stand. No sense wasting everybody's time to say otherwise.

The proceedings ended without comment or objection from the parties. After court recessed, a September 14, 2010 order was entered, stating that the trial judge initially accepted the jury's verdict but that the judge, upon his own consideration of the evidence, determined, as the thirteenth juror, that the weight of the evidence was against the verdict, declared a mistrial, and placed the case on the docket for retrial. The order stated the verdict was set aside. The trial judge ordered the case assigned to another judge and recused himself from any further proceedings.

A hearing was held before the second trial on the Defendant's motion to dismiss the indictment. The transcript of the trial court's findings and conclusions at the end of the first trial and the written order were received as exhibits. The Defendant argued that although the

written order referred to the trial judge's acting as the thirteenth juror, the judge did not mention the thirteenth juror in his findings on the record and that the judge set aside the verdict, preventing a second trial on double jeopardy principles. The Defendant further argued that the judge's setting the case on the docket was a contingency plan in the event the State appealed its ruling and this court reversed.

The trial court found that the original judge did not state that he was granting a new trial over the Defendant's double jeopardy protections. The court found that the judge did not like "the looks and the sound of this case, and it may technically be an assault, but it's not really." The court found that the previous judge thought the present case should have been an assault charge, rather than aggravated assault, and that the judge wanted to let a jury "have another shot it." The State confirmed for the court that the written order was drafted by the Defendant's previous counsel after consultation with the court and the prosecutor.

The trial court found that the trial judge wanted to prevent an unnecessary appellate process and that it chose to "set aside" the jury's verdict. The court found, though, that the judge was not "saying . . . the evidence caused it to have to be set aside." The court found that based on the "general language" used in the oral findings, the judge set aside the verdict as the thirteenth juror. The court found that the judge did not mention insufficiency of the evidence for setting aside the verdict, which would have been "key words." The court found that the judge set aside the verdict pursuant to his thirteenth juror obligation and to Tennessee Criminal Procedure Rule 33(d).

Tennessee Rule Criminal Procedure 29(b) states, "On defendant's motion, or its own, the court shall order the entry of judgment of acquittal . . . after the evidence on either side is closed if the evidence is insufficient to sustain the conviction[.]" *See State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). The standard used by the trial court to determine a motion for judgment of acquittal is "the same standard applied on appeal to determine the sufficiency of the evidence at a conviction." *Cottingham v. Cottingham*, 193 S.W.3d 531, 538 (Tenn. 2006); *see State v. Dankworth*, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995). The focus under Rule 29 is the sufficiency of the evidence, not the weight of the evidence. *State v. Gillon*, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997). A defendant may not be retried if the trial court grants a motion under Rule 29. *Dankworth*, 919 S.W.2d at 56.

In comparison, Tennessee Criminal Procedure Rule 33(d) states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. Upon request of either party, the new trial shall be conducted by a different judge." A new trial granted because the verdict is against the weight of the evidence is distinguished from a judgment of acquittal pursuant to Rule 29(b). Tenn. R. Crim. P. 33, Advisory Comm'n Cmts. (citing *Tibbs v. Florida*, 457 U.S. 31 (1982)). Rule 33 "requires

the trial judge to independently weigh the evidence and assess the witness' credibility," and the court "must be personally satisfied with the verdict." *Dankworth*, 919 S.W.2d at 56 (citing *Curran v. State*, 4 S.W.2d 957, 958 (Tenn. 1928)).

We conclude that the trial court did not err by denying the Defendant's motion to dismiss the indictment and that the trial judge at the first trial acted as the thirteenth juror pursuant to Tennessee Criminal Procedure Rule 33(d). The record shows that after reflection, the judge expressed on the record dissatisfaction with the jury's aggravated assault verdict. The judge did not believe the Defendant was guilty of aggravated assault and refused to let the verdict stand. In an effort to promote judicial efficiency, the court set aside the verdict and stated that its setting aside the verdict would be treated as granting a motion for a new trial. Although the court never mentioned Rule 33(d) language on the record, the written order shows the judge intended to act as the thirteenth juror when he set aside the verdict, which did not bar the second trial. We note the judge never used Rule 29 language addressing the sufficiency of the evidence. The Defendant is not entitled to relief on this issue.

Regarding the Defendant's claim that the second trial violated the "law of the case" doctrine, we note that the Defendant fails to cite any authority supporting his argument. In any event, the law of the case doctrine states that "'issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited.'" *State v. Jefferson*, 31 S.W.3d 558, 561 (Tenn. 2000) (quoting *Memphis Publ'g Co. v. Tennessee Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998)). The law of the case doctrine is not applicable in the present case because the court's granting a new trial as the thirteenth juror left all matters pending before the trial court and the Defendant's guilt undecided. The Defendant is not entitled to relief on this basis.

## III

The Defendant contends that the trial court erred by instructing the jury regarding attempted aggravated assault because the facts failed to support the instruction. The State responds that the Defendant has waived the issue because he failed to object at the trial. Alternatively, the State argues the instruction was proper. We agree with the State that the issue is waived.

Tennessee Rule of Criminal Procedure 30(b) states that after the trial court instructs the jury regarding the relevant law, the parties must be given an opportunity to object to the contents of the instructions. Rule 30(b) states, though, that "counsel's failure to object does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial." The record reflects that although the Defendant raised the issue in his motion

for a new trial, he did not object at the trial to the inclusion of the attempted aggravated assault charge.

Although the rules of criminal procedure do not prohibit relief in the absence of an objection, Tennessee Code Annotated section 40-18-110(d) (2010) states the trial court

> shall give the parties an opportunity to object to the proposed lesser included offense instructions. If the defendant fails to object to a lesser included offense instruction, the inclusion of that lesser included offense instruction may not be presented as a ground for relief either in a motion for a new trial or on appeal.

*Id*. The record reflects that the Defendant was charged with aggravated assault and that the jury convicted him of the lesser included offense of attempted aggravated assault. *See* T.C.A. § 40-18-110(f)(3) (stating "[a]n offense is a lesser included offense if [t]he offense is an attempt to commit the offense charged. . . ."). The Defendant has waived the issue, and we conclude that he is not entitled to relief.

## IV

The Defendant contends that his sentence is excessive. He argues that the trial court improperly applied enhancement factors regarding his previous convictions and the victim's age and that the court improperly sentenced him to split confinement. The State responds that the trial court did not abuse its discretion. We agree with the State.

At the sentencing hearing, the presentence report was received as an exhibit. The report shows previous convictions for three counts of theft of business services valued at $500 or less in 2003 and disorderly conduct in 1993. The report showed that the Defendant was a high school graduate and had various automotive collision repair certifications. The Defendant reported receiving treatment for a "mental breakdown" in 1988, bipolar disorder, periods of depression, and poor physical health. He reported having a steel rod in his body from his knee to his hip and having an artificial hip. His disability resulted from falling three stories at work. He used marijuana from age sixteen to twenty-three and drank thirty cans of beer daily but denied having current drug or alcohol problems. Mr. Rankin submitted a victim impact statement in which he only stated that he wanted the Defendant to stay away from him, his wife, and his son.

The Defendant addressed the court, stating

> I'd like to thank you for your patience . . . and as the district attorney said this has drug [sic] out for three and a half years, said that I played the system. I did not. This ordeal here I had a phone call to my parents' house and my mother is here today. That because of what happened with the – bore responsibility and this man called my mother's house and said that I will be going to jail because I have stepped on too many . . . toes down here.

> I've never had a chance to apologize to my uncle for hurting his feelings that day up there at that dumpster. And I've had to – court orders against me to leave him alone, don't go near him, don't talk to him. . . .

> Whether he likes it or not[,] I'm still his nephew and he's still my uncle, that's my mother's brother. I never wanted to hurt him that day. I don't want to hurt him today, but as you see on his report there, he doesn't want to be family with me, he just wants me to stay away. We used to have fun together and laugh, and carry on and talk about cars until this murder trial thing. I took no side, Your Honor, none. I didn't know these people my entire life until I come [sic] down here. A month after I get here this ordeal hit, and all of [a] sudden if I didn't take a side, I was . . . trash.

The trial court asked the Defendant if he thought he did something wrong, and the Defendant replied, "Yes, sir, I did by cussing him out. I'm embarrassed and . . . ashamed of it[.]" The Defendant said he had no intention of hurting or attempting to hurt Mr. Rankin and asked the court to accept his apology.

The trial court found that mitigating factors (1) and (8) applied. *See* T.C.A. § 40-35-113(1), (8) (2010). The court found that the Defendant's conduct did not cause Mr. Rankin physical injury. *See id.* § 40-35-113(1) ("The defendant's criminal conduct neither caused nor threatened serious bodily injury.") The court also found that the Defendant suffered from a physical condition that significantly reduced his culpability and noted that the Defendant was "totally disabled" at the time the offense was committed. *See id.* § 40-35-113(8) ("The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense[.]").

Regarding enhancement factors, the court found that factors (1) and (4) applied. *See* T.C.A. § 40-35-114(1), (4) (2010). The court found that the Defendant had a series of misdemeanor theft convictions. *See id.* § 40-35-113(1) ("The Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to

establish the appropriate range."). The court found that Mr. Rankin was of an advanced age and noted that he was older than the Defendant and that the age disparity "made it not a fair fight." *See id.* § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age or physical . . . disability."). The court stated that it was enhancing the Defendant's sentence by six months for the previous convictions and by three months for the age disparity. It sentenced the Defendant to two years and nine months with thirty days to serve in confinement and the remainder on probation.

The trial court found that confinement was not necessary to protect society from the Defendant because although the Defendant had previous theft convictions, this incident was "kind of out of line as far as . . . assaultive offenses." The court found that the factor regarding measures less restrictive than confinement having been frequently applied previously did not apply. The court found that confinement was necessary to avoid depreciating the seriousness of the offense because the Defendant threatened Mr. Rankin with a weapon. The court ordered thirty days' confinement.

A length of a sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; *see State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986).

Generally, challenges to a trial court's application of enhancement and mitigating factors are reviewed under an abuse of discretion standard. *Bise*, 380 S.W.3d at 706. We must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Id.* at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." *Id.*

-13-

More recently, our supreme court has applied the abuse of discretion standard with a presumption of reasonableness to "questions related to probation or any other alternative sentences." *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). Under the Criminal Sentencing Reform Act's 2005 revisions, a defendant is eligible for probation if the sentence imposed is ten years or less. *See* T.C.A. § 40-35-303(a) (2010); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008). A defendant has "the burden of establishing suitability for probation." T.C.A. § 40-35-303(b); *see Carter*, 254 S.W.3d at 347. In order for a defendant to meet this burden, he must show that "probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). "A defendant's sentence is based on 'the nature of the offense and the totality of the circumstances in which it was committed, including the defendant's background.'" *State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006) (quoting *Ashby*, 823 S.W.2d at 168 (citations omitted)). Furthermore, the statutory provisions regarding alternative sentences must be read together with the Sentencing Act as a whole. *See State v. Fletcher*, 805 S.W.2d 785, 787-88 (Tenn. Crim. App. 1991); *State v. Wagner*, 753 S.W.2d 145, 147 (Tenn. Crim. App. 1988). When determining if incarceration is appropriate, a trial court should consider if:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1) (2010); *see also State v. Hooper*, 29 S.W.3d 1, 5 (Tenn. 2000).

Regarding the trial court's application of enhancement factor (1), the record reflects that the Defendant had previous convictions for theft of services and disorderly conduct. We conclude that the trial court did not abuse its discretion by applying this factor.

Regarding factor (4), the trial court found that Mr. Rankin was of an advanced age, that Mr. Rankin was older than the Defendant, and that the age disparity "made it not a fair fight." Our supreme court has concluded that factor (4) "relates more to the natural physical and mental limitations of the victim than merely the victim's age." *State v. Adams*, 864 S.W.2d 31, 25 (Tenn. 1993), *superseded on other grounds by statute as stated in State v. Jackson*, 60 S.W.3d 738, 741-42 (Tenn. 2001). Likewise, the court concluded that factor (4)

was established when the victim was "incapable of resisting, summoning help, or testifying against the perpetrator" because of the victim's age or physical condition. *Id*. A general vulnerability "may play no part in the crime." *State v. Lewis*, 44 S.W.3d 501, 505 (Tenn. 2001). "A vulnerability that is wholly irrelevant to the crime is not 'appropriate for the offense'[.]" *Id*.

Although the record shows that Mr. Rankin was older than the Defendant, nothing in the record shows that the age disparity prevented Mr. Rankin from resisting, summoning help, or testifying against the Defendant. To the contrary, the evidence shows that Mr. Rankin argued with the Defendant and walked to his car to leave the scene. The record is absent any evidence showing that Mr. Rankin's age played a part in the offense. We conclude that the court's application of factor (4) was improper.

Although we have concluded that application of factor (4) was erroneous, the misapplication of an enhancement factor does not invalidate the sentence. The record supports the sentence imposed. The Defendant had a history of convictions for theft and disorderly conduct and admitted to smoking marijuana from age sixteen to twenty-three, although he had no drug-related convictions. Likewise, in determining the proper sentence, the court considered the nature and characteristics of the criminal conduct. *See* T.C.A. §§ 40-35-102, -103, -210; *see also Ashby*, 823 S.W.2d at 168; *Moss*, 727 S.W.2d at 236. The record shows that the offense was committed indirectly because of a family dispute and that the Defendant accused the victim of getting him fired. Rather than discuss the issue, the Defendant picked up the stick with the attached nail, cursed the victim, and followed the victim to his car. The record reflects that the appropriate principles of sentencing were considered and that the sentence imposed is within the appropriate sentencing range. We conclude that the trial court did not abuse its discretion.

Regarding alternative sentencing, the Defendant was eligible for full probation as his sentence was less than ten years. *See* T.C.A. § 40-35-303(a) (2010); *Carter*, 254 S.W.3d at 347. This court has stated that "[t]he determination of whether the appellant is entitled to an alternative sentence and whether the appellant is entitled to full probation are different inquiries." *State v. Boggs*, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). In determining whether to grant full probation, a trial court "may consider the circumstances of the offense, the defendant's potential or lack of potential for rehabilitation, whether full probation will unduly depreciate the seriousness of the offense, and whether a sentence other than full probation would provide an effective deterrent to others likely to commit similar crimes." *Id*.

In determining the manner of service, the trial court found that some form of confinement was necessary to avoid depreciating the seriousness of the offense. Although the court noted that the Defendant's conduct on the day of the offense was "kind of out of line" with his previous criminal history, the court did not want to overlook the seriousness of the Defendant's threatening Mr. Rankin with a weapon. The record reflects that the court considered the appropriate sentencing principles, and we conclude that it did not abuse its discretion by denying full probation. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE